# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

MARY EVELYN GANDEE,

      **Plaintiff,**

v.                                 **CIVIL ACTION No. 4:19cv74**

ANDREW M. SAUL,
Commissioner of Social Security,

      **Defendant.**


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Mary Evelyn Gandee ("Gandee") brought this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the decision by the Commissioner of the Social Security Administration ("Commissioner") to deny her claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act ("the Act") 42 U.S.C. §§ 1381-1383f. Gandee raises a single assignment of error in the decision by the Administrative Law Judge ("ALJ") that heard her claim, arguing the decision failed to properly apply binding Fourth Circuit precedent by accounting for limitations in concentration, persistence, and pace. See Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015).

This action was referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). The matter is now before the court on the parties' cross-motions for summary judgment. For the reasons stated below, I recommend that the court DENY Plaintiff's

Motion for Summary Judgement, (ECF No. 14), GRANT Defendant's Motion for Summary Judgment, (ECF No. 25), and AFFIRM the Commissioner's decision.

## I.   Procedural History

Gandee protectively filed an application for SSI benefits on February 8, 2016, alleging a disability onset date of January 1, 2008.  (R. at 169-74.)  The reviewing state agency denied her claim at the initial stage and on reconsideration.  (R. at 72, 90.)  Gandee requested a hearing before an ALJ, which took place on May 9, 2018, with Gandee represented by counsel.  (R. at 31-34.)  In a decision dated August 1, 2018, the ALJ concluded that Gandee was not disabled as defined by the Act and therefore denied her claim for benefits.  (R. at 10-19.)  The Appeals Council denied Gandee's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1.) Gandee then filed this civil action for judicial review.

## II.   Factual Background

### A.   Gandee's Medical and Treatment History

Gandee was thirty-two years old at the time of her alleged disability onset in 2008, and forty when she applied for SSI in 2016.  (R. at 73.)  She left school in the ninth grade, but later earned her GED.  (R. at 38, 547.)  She has limited work history, primarily as a store laborer and server.  (R. at 50.)

The Administrative Record contains evidence which long predates Gandee's filing date, including reports of her testing records from her primary school years which establish an academic history of borderline intellectual functioning.  (R. at 191-221.)  Because she has only applied for SSI benefits, she is not eligible for a retroactive award of benefits to before the filing date.  Thus, these early records are only relevant to the extent they demonstrate the state of Claimant's disability shortly before or after the date she applied for benefits.  See 42 U.S.C.

2

§ 1383(a)(1); 20 C.F.R. § 416.501 (limiting SSI benefits to the month following the filing date). This report therefore reviews Gandee's medical history and later evaluations beginning with years shortly prior to her filing date and continuing through the date of the hearing.

Throughout 2013, Gandee received mental health treatment from the Colonial Community Services Board (Colonial CSB). An April 9, 2013 treatment note reported she had been receiving treatment on and off for the past four years. She reported anxiety over the loss of disability benefits and concern about anger episodes. She was experiencing stress over caregiving responsibilities for her partner's fourteen-year-old son. The examiner noted Gandee's history of emotional behavior problems and non-compliance with treatment, which she attributed to brief periods of incarceration. (R. at 413.) Her speech was abrupt, but she was able to maintain a logical and relevant conversation. She acknowledged difficulty controlling anger and some paranoia, but denied delusions, feelings of hopelessness or worthlessness. She was optimistic about her future and hoped to obtain a part-time job. She was diagnosed with bipolar disorder, history of intermittent explosive disorder and polysubstance abuse (cocaine and alcohol, as well as nicotine dependence). She was placed on medication with a goal of stabilizing her mood swings, reducing anxiety, and avoiding continued use of illicit drugs. (R. at 413-14.) At a follow-up visit on August 28, 2013, Gandee reported continued mood swings and difficulty concentrating, but was working at a local restaurant and continuing to monitor her medication, which she felt helped to a degree. She denied thoughts of suicide and any use of alcohol or drugs. The general intellect was described as average, and her judgment and insight as good and fair respectively. (R. at 419.)

3

She continued treatment through Colonial CSB until June 2014 when records of her treatment there stopped. (R. at 423.) Neither party directed the court to any records of treatment during 2015, but Gandee began outpatient mental health treatment at Vision Behavioral in February 2016, shortly after applying for SSI benefits. During her first visit she reported that she struggled to control her anger, had racing thoughts and felt guilt over being incarcerated when her mother passed away. (R. at 458.) Her mental status exam revealed a cooperative demeanor, congruent affect, depressed mood, but a normal goal-directed thought process. She reported flashbacks but no delusions, suicidal or homicidal ideation. (R. at 464-65.) She was diagnosed with bipolar disorder, generalized anxiety disorder and cocaine withdrawal, and prescribed medication management and outpatient therapy. (R. at 468.) Treatment records with Vision Behavioral, which continued through the spring of 2016, generally showed that Gandee followed the directions of her healthcare providers and complied with her medication management. She attended all scheduled appointments and maintained her overall physical health during this period of treatment, which appears to have ended in July 2016. (R. at 449-59.)

There are no medical records documenting treatment from July 2016 to January 2018. At that time, Gandee was hospitalized for chest pain and shortness of breath due to a relapse of cocaine use. A stress test and echocardiogram showed no heart failure and her symptoms were considered likely due to "cocaine-induced vasospasms." (R. at 591). She reported that she was depressed but denied suicidal ideation and was prescribed medication and discharged in stable condition.

Thereafter, on January 10, 2018, Gandee reported to the Hampton/Newport News Community Services Board (HNNCSB) to pursue attending residential treatment. She reported her prior overdose on crack cocaine that resulted in her hospitalization and also stated that she

4

had tried to overdose on prescribed medication.  She was referred for intensive outpatient counseling, which began January 22, 2018.  (R. at 483-84, 550.)

On February 27, 2018, Gandee was hospitalized again, this time for acute respiratory failure related to cocaine and alcohol abuse and a possible overdose of nitroglycerin.  During her initial psychiatric consultation on March 1, 2018, she was withdrawn with disorganized thoughts and recommended for in-patient treatment.  (R. at 635-38.)  On March 5, 2018, Gandee's mood had improved and she denied any suicidal ideation.  She reported feeling much better and that it had been a mistake to overdose.  (R. at 705.)  A mental status exam showed she was irritable, unkempt and exhibited psychomotor agitation, but her speech was normal, and she stated, "I am fine."  (R. at 708.)  On discharge March 5, 2018, her mood, affect and thought content were all normal.  (R. at 628.)

Gandee's outpatient treatment at the HNNCSB continued from January 2018 through March 2018.  (R. at 476-557.)  A mental status exam on January 18, 2018, revealed normal appearance, behavior, eye contact, attitude, orientations, speech, mood, range affect, thought content, thought process, perception, memory, consciousness, and insight.  (R. at 549.)  Gandee was able to relate historical information.  She had a euthymic mood, affect was anxious but appropriate, and her speech fluent with a linear goal-directed thought process, and no psychotic features.  (Id.)  On January 22, 2018, Gandee attended group therapy where she reported a good mood, shared that she had lost her job, her wife, and "almost [her] life" due to drug use.  (R. at 489.)  On January 29, 2018, Gandee reported she had experienced a panic attack on her way to work.  She stated she wanted in-patient treatment for her difficulties, but her mental status exam was unchanged and she reported a "good" mood.  (R. at 496.)  At a medication management visit with Dr. Faisal Moshin, M.D., on February 13, 2018, Gandee reported that she was "doing pretty

well." (R. at 517.)  Her mental status exam revealed relevant coherent speech and goal-directed thought processes.  (Id.)

**B.      Opinion Evidence**

The record contains opinions and assessments regarding Gandee's disability status from multiple providers retained by the agency dating back to 2008.  On May 31, 2008, consulting psychologist Thomas Kupke, Ph.D. examined Gandee in connection with an earlier application for benefits.  At the time, Gandee was living at home with her parents.  She reported a history of problems relating to "acting out" when she was younger, including an arrest for breaking and entering.  She was frequently truant and at one point took her parent's truck and wrecked it.  She related that she had previously been diagnosed "manic depressive" and had a criminal record consisting mostly of petty crimes, including credit card fraud.  She worked only intermittently as a cook, cashier in a department store and shipping clerk.  At the time of her evaluation in 2008, she was living with her parents.  She had no access to transportation, stating that she had failed the written driver's examination five or six times.  She claimed to require supervision with cooking as a result of leaving things on the stove and had difficulty shopping as a result of an inability to make change.  (R. at 329.)

Dr. Kupke administered both intelligence and memory tests, reporting the results in detail.  Gandee earned a Full-Scale IQ score of 72, which fell within the borderline range of intellectual ability.  He wrote this was "reasonably consistent with expectation for a person of this educational background."  With regard to the memory test, Kupke assessed her performance as "mildly abnormal for a person of this age."  However, he noted that her scores were within line for her other cognitive skills and that her working memory represented a cognitive strength approaching the lower limits of average.  (R. at 331.)  Her mental status exam revealed fluent

speech and an appropriate manner.  Dr. Kupke found her mood mildly depressed, but she demonstrated an appropriate affect, adequate impulse control, and intact judgment and insight. She denied any suicidal ideation.  (R. at 330.)  He diagnosed depressive disorder and borderline intellectual functioning.  He wrote that she would be incapable of performing detailed and complex tasks due to her modest intellectual and memory abilities, but that she "should be capable of executing simple/repetitive work assignments."  (R. at 332.)  He felt her work performance would be relatively inconsistent due to problems tolerating boredom and that she would require extra supervision in learning and performing tasks; but he found that she should be capable of interacting with coworkers and the public on a superficial level and that her psychiatric symptoms were not likely to prevent her from completing a typical work day or work week.  (R. at 332.)

Gandee was also examined by licensed psychological associate Jeffrey Hildreth on March 27, 2015, whose opinions were endorsed by psychologist Thomas Toy, Ph.D.  In their joint opinion, they noted that her personal appearance revealed "well-tended" hygiene, good eye contact, and speech that was well articulated.  She had a good memory for events and dates and appeared a reliable historian.  Her affect was anxious with little change throughout the visit.  She reported only a fair appetite and stated that she had not been keeping up with medication as a result of lack of funds.  She reported a similar history to her last evaluation, including special education classes in her youth as a result of learning disabilities, a sporadic work history, and previous diagnoses of depression and bipolar disorder.  (R. at 427.)  Her performance on the WJ-III Test of Achievement placed her in the low range with a low average performance in reading, low in written language and expression, and very low in mathematics and math calculation skills. (R. at 428).  Her Full-Scale IQ score yielded a total score of 68, which placed her in the mildly

7

intellectually deficient range of intelligence. She also took the Beck Depression Inventory resulting in a total score of 43, indicative of the presence of a severe level of depressive symptoms. (R. at 429.) Her examiners concluded that she was in the mildly deficient to borderline range in intellectual ability, but with levels of academic achievement somewhat higher than her current IQ would predict. Along with her depressive symptoms, her self-report of psychiatric history indicated that her psychiatric symptoms were interfering with her intellectual acumen. They concluded that she would likely experience difficulty in relating to others, including fellow workers and supervisors, and difficulty tolerating the stress and pressures associated with day-to-day work activity, but that she would appear capable of managing benefits. The evaluators also concluded that her ability to sustain attention to perform simple repetitive tasks in the current environment appeared to be unimpaired. (R. at 429.)

C.      **The ALJ Hearing**

Gandee appeared with counsel at the May 9, 2018 hearing before the ALJ. She testified regarding her living arrangements with her aunt, daily activities, and limitations related to her depression and past substance abuse. (See R. at 37-48.)

Gandee testified that she had recently separated from her wife, and as a result was living alone in an apartment, but that her aunt helped her with utility bills, cooking, and keeping track of her medications. She described difficulty using public transportation because of an inability to figure out the bus schedule. She described her past education, leaving school in the ninth grade, but testified that she could read "somewhat," suggesting big words were a problem and estimating that she comprehended at the fourth or fifth grade level. (R. at 37.) She described her prior period of disability, which ceased during a term of incarceration. She successfully completed probation following her release from custody. (R. at 40-41.) She described daily

8

struggles with depression, stating that "it sucks, being honest." (R. at 42.) She related that medication sometimes gave her difficulty sleeping and that she had been treating regularly with the HNNCSB. She stated that she sometimes feels fine, but then "something can come along, and I can do something and it's like I'm an emotional roller coaster sometimes," which makes her frustrated and aggravated. (R. at 43.) When asked if she did things around the house regarding cooking, cleaning and things of that nature, she stated that she could clean, but that her aunt doesn't want her using the stove because she has forgotten things while cooking.

With regard to work history, she stated that she had previously worked as a cook but that she had a difficult time keeping up with orders during the rush periods. (R. at 45.) She described her then-recent relapse into drug use, stating that it came after a two-year period of sobriety and that she believed it was brought about by the separation from her wife. (R. at 47.) With regard to hobbies, she stated that she plays with her dogs and sometimes goes outside. She stated that she did socialize but liked to avoid large crowds, which made her "skittish." (R. at 48.)

The ALJ also heard testimony from a vocational expert ("VE"). The VE characterized Gandee's prior work as a waitress as light and semi-skilled, (R. at 50), and as a cook and store laborer as medium, skilled and unskilled respectively, (Id.). The ALJ's hypothetical for the VE posited a person of the same age, education, and work experience as Gandee, and with the following limitations:

> Limited to light work exertional level with only simple, routine, repetitive one - to
> - two step tasks; with minimal if any reading, writing and math; no fast paced tasks
> such as assembly-line jobs involving production quotas; only occasional brief and
> superficial interaction with the public or co-workers; no work in or around crowded
> conditions; and no exposure to hazards.

(R. at 50-51.) The VE testified that jobs would be available to such a person, identifying housekeeping cleaner (DOT 323.687-014) with 130,000 jobs nationally; bakery racker (DOT

524.687-018) with 9,000 jobs nationally; and router (DOT 222.587-388) with 27,000 jobs nationally. The VE also stated that there were no conflicts between her testimony and the DOT descriptions of these positions. (R. at 51.) On cross-examination by Gandee's counsel, the VE testified that extra supervision beyond the training period for these unskilled jobs would be more like "a sheltered workshop."

**D.**     **Post-Hearing Evidence**

Although the ALJ left the record open for additional medical records, from treatment described in North Carolina, none was submitted. (R. at 52.)

### III.     Standard of Review

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the Commissioner applied the proper legal standard in evaluating the evidence. See 42 U.S.C. §§ 405(g), 1383(c)(3); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938). It may be less than a preponderance of evidence but is more than a "mere scintilla." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at

589 (quoting Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. 42 U.S.C. §§ 405(g), 1383(c)(3); Perales, 402 U.S. at 390. Reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### IV.    Analysis

Gandee's brief identifies a single error in the ALJ's decision that she claims warrants remand. She does not contest the ALJ's assessment of her RFC but contends that he did not perform the function-by-function analysis required under Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), or fully account for her moderate limitations in concentration, persistence and pace found at Step 3 of the disability inquiry. Mem. Supp. Pl.'s Mot. for Summ. J. 4, 17-20 (ECF No. 13). As explained below, this report finds no error in the ALJ's application of Mascio, concludes that remand is not warranted, and recommends that the court affirm the Commissioner's decision.

### A.    Framework for SSA Disability Evaluation

Title XVI of the Act provides SSI benefits to "financially needy individuals who are aged, blind, or disabled regardless of their insured status." Bowen v. Galbreath, 485 U.S. 74, 75 (1988) (citing 42 U.S.C. 1382(a)). As relevant here, the Act defines "disability" as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A)); accord 20 C.F.R. § 416.905(a). An impairment renders an individual

11

disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy. See § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).

SSA regulations set out a sequential analysis which ALJs use to make their determination. 20 C.F.R. § 416.920(a)(4). Specifically, the regulations direct the ALJ to answer the following five questions:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3. Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4. Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5. Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled. An affirmative answer to questions three or five establishes disability. The claimant bears the burden of proof during the first four steps. If the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 4:16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled. 20 C.F.R. §§ 416.920(a)(3); 416.920b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the

subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age." Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)).  Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ.  Hays, 907 F.2d at 1456 (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

**B.**    **The ALJ's Decision**

The ALJ first found that Gandee had engaged in substantial gainful activity (SGA) since January 1, 2008, the alleged disability onset date; but because there had been a continuous twelve-month period without SGA, she was not denied at step one.  (R. at 12.)  The ALJ next identified several severe impairments:  affective disorders (bipolar, depression and adjustment) anxiety, personality disorder, borderline intellectual functioning and substance use disorder.  (R. at 12.)   At step three, the ALJ concluded that Gandee did not have an impairment or a combination of impairments that met or exceeded the requirements of any listed impairment. (R. at 13.)

Having reached step four, the ALJ set out Gandee's RFC:

> [C]laimant has the residual functional capacity to perform less than a full range of light work . . . .  The claimant is limited to simple, routine, and repetitive one to two-step tasks with minimal, if any, reading, writing, and math.  In addition, the claimant has to avoid fast-paced tasks such as assembly line jobs involving production quotas.  The claimant is limited to occasional brief and superficial interaction with the public and co-workers . . . [and must] avoid working in or around crowded conditions . . . [and] hazards such as moving dangerous machinery and unprotected heights.

(R. at 14.)  Using this RFC, the ALJ concluded that Gandee was unable to perform her past work. (R. at 18.)  Finally, at step five, the ALJ determined that, based on the testimony of the VE and the ALJ's own consideration of the Medical Vocational Guidelines, 20 C.F.R. Pt. 404, Subpart

P, App. 2, Gandee could adjust to other work that existed in significant numbers in the national economy. (R. at 19.) He therefore entered a finding that Gandee was "not disabled." (R. at 19.)

**C.**      **The functional limitations imposed by Claimant's mental impairments are adequately addressed by her RFC.**

If an ALJ's five-step analysis reaches step four, the ALJ will first make a finding on the claimant's RFC using all relevant evidence, medical and otherwise. 20 C.F.R. §§ 416.920(e), 416.945. A claimant's RFC is the most an individual can do despite the physical and mental limitations on his or her ability to do work. Lewis v. Berryhill, 858 F.3d 858, 861-62 (4th Cir. 2017). Residual capacities "must be expressed in terms of work-related functions" when assessing a claimant's RFC. SSR 96-8p, 1996 WL 374184, at *6 (July 2, 1996).

Gandee does not address in detail the ALJ's evaluation of the medical evidence in the record and his resulting conclusions regarding the limits imposed by her mental impairments. She has not cited any physician opinion or medical evidence suggesting she is more limited than expressed by the ALJ's RFC findings. Indeed, her medical records contain no opinion from any treating or consulting physician suggesting that her impairments would result in limitations that preclude all work. But because the ALJ found at step three of the sequential analysis that Gandee was moderately limited in concentration, persistence, and pace, she argues the RFC fails to account for those limitations. As a result, she argues remand is required under the Fourth Circuit's decision in Mascio.

In Mascio, the Fourth Circuit held that the ALJ had not accounted for the claimant's moderate limitations in concentration, persistence and pace or social interaction merely by limiting the claimant to unskilled work. 780 F.3d at 635. Unless the residual functional capacity assessment includes a narrative discussion describing why the moderate limitation did not produce functional limits on the ability to work, those limits must be addressed by the RFC. Id.

14

at 636 (quoting SSR 96-8p).  When the ALJ does fashion an appropriately limited RFC or performs an explicit function-by-function analysis to explain – explicitly or implicitly[1] – why additional limitations are not needed, the Mascio, standard is satisfied. Id. (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)); Watson v. Colvin, No. 2:15-cv-407, 2016 WL 4154920, at *1, *3 (E.D. Va. Aug. 3, 2016) (reviewing cases decided after Mascio).

As in this case, the claimant in Mascio alleged mental impairment which resulted in work related functional limitations.  At step three, the ALJ (as here) concluded that the claimant was moderately limited in concentration, persistence, and pace.  The ALJ's RFC in Mascio attempted to accommodate these limitations by limiting the claimant to only unskilled work. Id. at 635. But the Fourth Circuit ordered remand after finding the ALJ's opinion "sorely lacking" in the required analysis under SSR 96-8p. Id. at 636.  The court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." Id.  However, it held that when the ALJ's opinion "fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review," remand is appropriate. Id.; see also SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).").  The Mascio standard does not require exhaustive

---

[1] Mollett v. Colvin, No. 2:13-cv-28018, 2015 WL 1481842, at *3 (S.D.W. Va. Mar. 31, 2015) ("[ALJ did not err when he conducted] a lengthy and thoughtful analysis supporting his function findings, with reference to both the evidence adduced at the administrate hearing and the opinions of various medical and psychological experts, explaining whom he credits and why.  While it might be argued that he did not parse and compartmentalize the functional limitation discussion, a reviewer can readily ascertain the ALJ's thinking as it is evident in his discussion of the claimant's testimony and the other evidence of record.  Under these circumstances, nothing more is required." (citations omitted)).

15

detail, but a reviewing court must be able to ascertain how an ALJ reached his or her decision. See Dennis v. Berryhill, 262 F. Supp. 3d 303, 309 (W.D.N.C. 2019) (ALJ must resolve evidentiary conflicts and support narrative discussion with citations to supporting evidence). The ALJ's opinion cannot leave the reviewing court to "guess about how the ALJ arrived at his conclusions." Mascio, 780 F.3d at 637.

ALJ opinions satisfy Mascio's analytical rule so long as they identify supporting evidence and explain why conflicting evidence was less credible. See, e.g., Woodlief v. Berryhill, No. S:16-cv-191, 2017 WL 4164076, at *4-5 (E.D.N.C. Sept. 20, 2017) (upholding ALJ's opinion because it supported its conclusion by reference to the evidence and explained why plaintiff's subjective statements were less credible); Mollett v. Colvin, No. 2:13-28018, 2015 WL 1481842, at *3 (S.D.W. Va. Mar. 31, 2015) (rejecting Mascio challenge because "a reviewer can readily ascertain the ALJ's thinking as it is evident in his discussion of the claimant's testimony and the other evidence of record"). "[W]hen medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020) (alteration in original) (quoting, Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011). So long as this functional analysis is explained in the record, hypotheticals do not require any talismanic formulation to address such deficits. See id. (holding that hypotheticals can account for limitations in concentration, persistence, and pace when the "questions otherwise implicitly account for these limitations").

16

Here, the ALJ properly considered and explained the relevant evidence of Gandee's mental limitations when formulating her RFC. The ALJ specifically cited to <u>Mascio</u>, and found that Gandee's ability to concentrate "is somewhat affected by her mental impairments," but observed that her ability to watch television all day, play with her dogs, and go grocery shopping – along with the other evidence cited in the RFC analysis, including evidence of significant improvement when claimant complies with her recommended treatment and avoids abusing substances – led him to conclude the RFC limits he imposed were adequate.

Among the evidence cited in his opinion, the ALJ considered treatment records from the Colonial CSB as well as notes from Gandee's two hospitalizations in early 2018. He noted that the medical records did not support a loss of functioning as severe as Gandee described during her testimony so long as she was compliant with her medications and avoiding illicit drugs. (R. at 16.)  He cited treatment notes reflecting Gandee's admission that her long-term cocaine addiction contributed to her inability to retain employment. (R. at 16 (citing R. at 556).)[2]

The ALJ also gave moderate weight to Mr. Hildreth's and Dr. Toy's 2015 opinions regarding Gandee's borderline intellectual functioning – which he found consistent with her educational records. Their opinion states that, although significantly limited, Gandee was capable of performing the work outlined in her restrictive RFC. (R. at 17.)  In fact, the opinion dealt directly with the issue of persistence and concentration, noting that "[h]er ability to sustain attention to perform simple, repetitive tasks in the current environment appeared to be unimpaired." (R. at 429.)  This medical opinion mirrors the ALJ's restrictive RFC. An ALJ is

---

[2] Neither party has directly addressed the issue of whether Gandee's substance abuse may have been a contributing factor to her concentration-related impairments. <u>See</u> <u>Sizemore v. Berryhill</u>, 878 F.3d 72, 79-81 (4th Cir. 2017). In fact, the ALJ's finding suggests her periods of more severe limitation may be related to substance abuse. (R. at 16); <u>see</u> 20 CFR § 416.935(b)(1). ("The key factor . . . is whether we would still find you disabled if you stopped using drugs and alcohol.").

entitled to credit the opinions of non-treating physicians that are consistent with the entire record. See 20 C.F.R. § 416.913a(b)(1) (requiring ALJs to consider, but not necessarily adopt, prior administrative medical findings); see also Bewley v. Berryhill, No. 2:17-cv-643, 2018 WL 7017995, at *7-8 (E.D. Va. Sept. 24, 2018) (affirming ALJ opinion that credited state agency consultant's opinion over treating physician's opinion in light of the latter's inconsistency with the record evidence), R. & R. adopted, 2018 WL 6323072 (E.D. Va. Dec. 4, 2018).

The ALJ gave little weight to the findings of Dr. Kupke from 2008 that Gandee would require extra supervision or could not accept instructions from supervisors. As the ALJ noted, this opinion was more than seven years before the relevant period of inquiry, and the more recent opinion of Dr. Toy coupled with Mr. Hildreth's testing results, support the conclusion that Gandee could accept appropriate supervision of assigned tasks within the limits of her RFC. (R. at 17.)

After considering all this evidence, the ALJ crafted a detailed hypothetical which accounts for the limitations he found. Among the specific restrictions directed to her moderate mental limitations, the hypothetical provided that she would be limited to simple, routine, one–to two-step tasks with minimal, if any, reading, writing, and math. She must avoid fast-paced tasks such as assembly line jobs involving production quotas,[3] have only occasional, brief superficial interaction with the public and co-workers, and avoid crowded conditions, dangerous

---

[3] Mascio established that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter would account for a claimant's limitation in concentration, persistence or pace." 780 F.3d at 638. After Mascio, such limits were sometimes addressed by restricting the claimant to "non-production work," but the Fourth Circuit has since held that terms like "production rate" or "demand pace" were sometimes too vague standing alone to satisfy the ALJ's obligation to create a "logical bridge" between the evidence and the RFC limits. Thomas v. Berryhill, 916 F.3d 307, 312 (4th Cir. 2019). Here, the ALJ's RFC is far more detailed, and specifically supported by the medical records he relied on.

machinery, and unprotected heights. (R. at 14-15.)  Despite these voluminous restrictions, each of which finds support in the medical opinions cited by the ALJ, Gandee claims remand is required based on a narrow pairing of individual restrictions with other step three findings.  In her Reply, she argues that these restrictions all address other functional limitations found at step three.  Reply Mem. 4-5 (ECF No. 16).  But as noted by the Fourth Circuit, Mascio did not create any per se rule regarding how the RFC needed to accommodate particular functional limitations.  Shinaberry, 952 F.3d at 121.  The inquiry requires a reviewing court to consider both the analysis of medical evidence in the record and the resulting limitations.  Sizemore, 878 F.3d at 80-81 (rejecting Mascio argument and affirming Commissioner where ALJ's detailed medical findings provided substantial support for the RFC limitations).  See also, Eastwood v. Colvin, No. 3:15-cv-156, 2016 WL 805709, at *4 (E.D. Va. Feb. 12, 2016) (holding ALJ accommodated claimant's concentration and pace limitations by limiting her to (1) few workplace changes; (2) little independent decision-making; and (3) less than an assembly line pace); Hunter v. Berryhill, No. 3:17-cv-112, 2018 WL 310138, at *13 (E.D. Va. January 5, 2018) (finding ALJ complied with Mascio by limiting claimant to "simple, routine tasks, not at production rate, where she has no more than occasional changes in routine work setting, occasional contact with supervisors . . . and no interaction with the public").  Here, the ALJ properly related the medical evidence to Gandee's ability to function in the workplace as required under Mascio.  And his detailed, highly restrictive RFC adequately accounts for the limitations imposed by her affective disorders, anxiety, and borderline intellectual functioning, so long as she avoids substance abuse.  Indeed, she has identified no medical evidence to the contrary.

This report therefore finds no <u>Mascio</u> error in the RFC determination. The ALJ properly considered both the objective medical evidence and Gandee's subjective statements regarding her symptoms, and properly reconciled conflicting evidence in reaching his conclusion. His detailed RFC findings adequately accommodate the functional limitations caused by her mental impairments.   Accordingly, his opinion is supported by substantial evidence, and Gandee's <u>Mascio</u> challenge does not warrant remand.

## V.    <u>Conclusion</u>

For the foregoing reasons, I recommend that the court DENY Plaintiff's Motion for Summary Judgement, (ECF No. 12), GRANT Defendant's Motion for Summary Judgment, (ECF No. 14), and AFFIRM the final decision of the Commissioner.

## VI.    <u>Review Procedure</u>

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, <u>see</u> 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  <u>See</u> Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.     A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Newport News, Virginia

June 8, 2020